## South Covington & Cinti. St. Ry. Co. v. Cahill.

(Decided January 23, 1913.)

### Appeal from Kenton Circuit Court.
(Common Law and Equity Division.)

Street Railroads—Action Against for Personal Injuries—Verdict—Evidence.—In an action against a street railway company for injuries to a passenger on its car resulting from the impact of the car with a telephone pole, the evidence showing that the life of appellee had been practically wrecked and that she was converted from a strong, healthy woman into a helpless invalid, it cannot be said that the verdict for $2,500, as compensation for her injuries, is excessive.

ROBERT C. SIMMONS, for appellant.

B. F. GRAZIANI, for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

On February 8, 1911, one of the Ft. Mitchel cars of the South Covington & Cincinnati Street Railway Company was derailed and ran into a telephone pole with such force as to break the pole. Kate Cahill, a woman fifty-two years of age, was, at the time, a passenger on the car. Charging that, by reason of the impact of the car with the telephone pole, she was seriously and permanently injured, she sued the company for damages. The company denied liability, but, upon the trial, was unable to offer any satisfactory explanation for the derailment; and the only real question was the extent of plaintiff's injury. She recovered a verdict for $2,500, judgment was entered thereon; the company appeals and seeks a reversal upon the ground that the sum awarded is excessive.

The evidence shows, without question, that, prior to the accident, appellee was enjoying good health; was strong, active, and able-bodied; that since that time she has been exceedingly nervous, and has had only partial use of one arm and hand. There is an enlargement upon her neck or top of the shoulder, the presence of which is neither satisfactorily explained nor understood by any of the physicians who testified in the case. Immediately following the accident, she was attended by Dr. Senour, who testified relative to her injuries as follows:

"Q. Tell the jury what you found, and when it was you were called?

A. It was in the evening of the 8th day of February, last year. I found Mrs. Cahill with a partly dislocated wrist, two of her fingers were strained, and swollen considerably, she had a slight scalp wound, she had a bruised place on one of her limbs, but I forgot whether the right or left; I am not sure, but it was in the anterior portion of the tibia, a place possibly as large as a dollar. She was suffering considerably from a nervous shock, seemingly. That's the condition I found her in at that time.

Q. What treatment did you prescribe for her?

A. I reduced the dislocation, I put on ordinary dressings for dislocation and strain; I prescribed nerve sedative, that she might get some rest.

Q. How long did you continue to wait on her from time to time on account of that injury or nervousness?

A. I was there that evening, I prescribed for her. They called me up next day, I sent her over some medicine to quiet her nerves, that she could get some rest. About two days after that I called on her again, and I think I called the next day. I made about four visits to her at that time."

This was the extent of his treatment of her immediately following the accident. He did not see her again until in the fall. From his observation of her at times when he had seen her, between the date of the accident and the trial, he testifies as follows:

"Well, since I have seen her during that time, each time I have seen her she has appeared to be rather nervous."

He further testified that upon an examination, made shortly before the trial, he found that the fingers on one hand were stiff, and she had little use of them; that she had a freer use of her arm, and that she was in a nervous condition, which was probably caused by shock, although he admitted on cross-examination, that this condition might be brought about by other causes, to-wit: change of life.

Dr. Wm. Corey testified that he had known the appellee for many years; that he did not examine or treat her at the time of her injury, but that, about four months before the trial, which was some eight or nine months after the injury, he did examine her. Relative to this examination, he said:

"I found on top of the shoulder, on the left side, an

enlargement. She complained a great deal of the left arm, and she had had use of the hand and arm, and kind of stiffness, and some inflammatory condition in the fingers, seemed to be a little fullness there and little stiffness in the fingers of the left arm.''

When asked to locate the enlargement on the shoulder he testifies:

''It was just on top of the clavicle—clavicle bone, fullness there possibly I presume, it is about the size of an egg, almost, when I saw her, something like that.''

When asked what would likely have produced this enlargement, he says:

''She may have had a cyst, I don't know what that enlargement was, she may have had a cyst there, she may have had a tumor, she may have had an injury there, an inflammatory condition would develop into enlargement, from irritation.''

He testifies that he did not know the cause of the enlargement; though, if produced by the injury which happened some seven or eight months before his examination, the time elapsing between the date of the injury and his examination would have been ample for the enlargement to form. This same witness examined appellee a week or ten days before the trial, and as to this second examination he testifies:

''At that time I found this same enlargement there at the top of the shoulder. She complained of the acute trouble in the arm on the left side—left arm, with, I think, inability, or didn't have good use of the hand. Her fingers, I think, little finger and second finger. She complained of pain in them, and I think there was some little fullness about the joints, that is, in the fingers, on the left side.''

From his examination and observation of her upon each occasion, he says she was in a nervous condition; and this nervous condition produced a bad physical condition.

Dr. B. F. Eckman testified that he first saw appellee in the summer following the accident. At that time, he says:

''I found she was extremely nervous, I found that she had some lowered temperature of the left hand, three fingers of the left hand; she complained of numbness in that side. I found a bulging just above the collar bone, on the left side of the neck.''

"If I remember right, she had some trouble with the right knee, I am not sure, I don't remember. I think perhaps that was trivial."

He was present at the time the patient was examined, shortly before the trial, by Dr. Courtney, and as to that examination, says:

"I found she still had that neuresthenia, still had that enlargement in the neck, still had that injury to the ulnar nerve that she had before, which produced that numbness and lowered temperature in these three fingers."

The witness explains that neuresthenia means nerve shock, a condition in which the nervous system has not proper control over the person, due to impairment; and that this condition may result from shock. From a history of the patient's case, the witness expresses the opinion that her nervous condition was the result of shock. When asked as to the condition of her nervous system, he says, "Her nervous system is wrecked." Upon the extent of her injury, he testifies that, in all human probability, it was permanent; that her injury consisted "of a bruise at the elbow, an inflammatory exudate thrown out around this nerve, having by pressure rendered the nerve numb. It is the left hand, instead of the right; rendered the nerve numb. She hasn't proper control of those three fingers, hasn't force, contractual force of those three fingers that she had before." When asked, whether or not that condition would continue, he answered: "It has existed for a year, and no better; it is chronic." In defining what he meant by chronic, he says: "Prone to continue, will continue, no special hope of any recovery." He, like the other physicians, testifies that he was unable to state what the enlargement on the shoulder or neck was, but that it was probably produced by injury. As to her nervous condition, he testifies:

"Her general actions, her heart's action; her heart's action is increased by motion beyond a reasonable degree—beyond normal amount, she if flustrated continually. I don't know how to explain any better than that. She has a continual sense of impending danger, something going to happen to her if she starts out, or if she undertakes to do this or that. This traumatic neuresthenia produces a condition of lassitude, they don't feel equal to the emergency of doing anything."

These three witnesses were introduced by the plaintiff.

Dr. E. Courtney, who examined appellee a few days before the trial, testified:

"I looked over her carefully, found her to be nervous, found slight enlargement on the right side of the neck—left side of the neck. She complained of numbness in the little finger and ring finger on the left side, and some numbness in the region on this side—ulnar nerve."

"Q. What did you find as a result of your examination—what did you discover?

A. No physical evidence of any injury I could see, unless the enlargement was due to some injury.

Q. What was the nature of that enlargement?

A. Seemed to be thickening of the tissues in the neck.

Q. How much of an enlargement was it?

A. It wasn't very much of an enlargement, little enlargement on the right side.

Q. You say it seemed to be result of injury; would that be direct force applied to the point?

A. Direct force or strain.

Q. If it was the result of a blow, how would the blow have to be applied—directly to the point.

A. No sir, possibly produced by blow on the neck twisting."

He testified that he examined her heart, and it seemed to be normal; that he found her in a nervous condition, which was likely accentuated or aggravated by the pendency of the law suit; that when the litigation was ended the nervousness would likely be lessened, if not relieved; and that the nervous condition may have been due to a change of life; that he found no organic affection; and that it was the history of such cases that the patient would recover. When the way and manner of the injury in which appellee was injured was described to him, and he was asked whether an injury received in that way would produce an organic trouble, the witness answered, "Not necessarily, no, sir, not usually." Upon cross-examination, he testified that appellee's nervousness was of a rather aggravated form, which, at times, approached hysteria; that this condition might be brought about by nervous shock; and that it was not feigned but real, although, in his judgment, she would most probably entirely recover.

Thus, from the testimony of the physicians, we find that appellee thirteen months after the date of the injury was still suffering in the same manner that Dr. Senour testifies he found her on the evening of the day upon which she received the injury. All of them agree that this condition may have been brought about by the nervous shock, and the testimony showing that, prior to the date of this injury, she was a strong woman, giving no evidence of the existence of this nervous condition, the jury was warranted in finding that it was the result of the shock. None of these experts could tell, with certainty, whether or not this condition would continue. Dr. Eckman gave it as his opinion that the injury, is permanent, and that there would be no recovery; while Dr. Courtney testified that, in his judgment, there will be a recovery, more or less perfect. The testimony of Dr. Senour and Dr. Corey does not indicate clearly just what their opinions upon this point are; but all agree that appellee, after the lapse of thirteen months from the date of the injury, was in a highly nervous condition, and had, in the main, lost the use of one arm and the fingers upon the hand of that arm. There was likewise an enlargement upon her neck or shoulder, which none of the doctors either understood or could account for, except that Dr. Courtney says that it might have been produced by a strain on the neck. If it was so produced, this same strain that was sufficient to produce this enlargement on the shoulder may have likewise contributed to bring about this nervous condition, which Dr. Courtney describes as, at times, bordering on hysteria. This evidence shows that the life of appellee has been practically wrecked. The injury to her arm and hand is but slight as compared to the shock to her nervous system, which has converted a strong, healthy woman into a practically helpless invalid. We cannot hold that $2,500, as compensation for injuries of this character, is excessive. The jury had appellee before it. It saw and observed her during the trial, and while upon the witness stand. It heard the witnesses testify, and is better qualified to judge of the value of their testimony and the extent of appellee's injuries, than we can possibly be. Even if we felt that the verdict was large, we would be unauthorized to disturb it upon the ground that it is excessive, unless, from the evidence, we consider it so excessive as to strike one, at first blush, that

it was entirely disproportionate to the injuries sustained, and hence, must be the result of either prejudice or passion on the part of the jury. There is no intimation that the jury, who tried this case, was not composed of fairminded, reasonable men; and we are inclined to concur with them, in their conclusion, that the sum awarded was no more than fair compensation to appellee for the injuries sustained.

Judgment affirmed.